899 So.2d 348 (2005)
Carlos LEE, Appellant,
v.
STATE of Florida, Appellee.
No. 2D03-4584.
District Court of Appeal of Florida, Second District.
March 16, 2005.
Rehearing Denied May 2, 2005.
*349 Diane Buerger of The Buerger Law Firm, P.A., Bartow, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Michele Taylor, Assistant Attorney General, Tampa, for Appellee.
CASANUEVA, Judge.
Carlos Lee, convicted of three counts of capital sexual battery on a child under the age of twelve, appeals from orders denying his motion for postconviction relief, both summarily and after an evidentiary hearing. Because Mr. Lee's trial counsel failed to thoroughly investigate the significant medical evidence presented at trial and its relationship to the victim's prior allegations of abuse, we hold that his conduct fell below the standard of reasonable effectiveness. Because this was the classic familial sexual abuse situation, with no eyewitnesses, no direct physical evidence of abuse, nor even similar fact evidence, the defendant was prejudiced by his counsel's failure to understand or to act upon the treating physician's crucial testimony. This court's confidence in the outcome of the proceedings has been undermined. Accordingly, we reverse the order denying postconviction relief and remand for a new trial.

The Capital Sexual Battery Trial
Mr. Lee was charged with sexual battery on his stepdaughter, K.W., who was approximately ten years old when the crimes allegedly occurred and almost twelve when she testified at the June 1998 trial. K.W. did not provide clear details of the circumstances surrounding the sexual abuse. K.W. testified that on (probably) three occasions her mother went to a nearby grocery and left her in their trailer home with Mr. Lee and her younger brother. Mr. Lee then came into her bedroom and sexually assaulted her by placing her on the floor and putting his "wiener" into her "pee pee." He told her not to tell anyone about what had happened, and she did not do so.
The trial evidence revealed that Mr. Lee's marriage to K.W.'s mother, Marla Lee, was contentious. Several months after the alleged abuse, Mr. Lee left the family for another woman. Soon thereafter, Mrs. Lee was incarcerated, and K.W. and her brother moved in with their grandmother in another town. The children had not seen the grandmother in several years and did not really know her.
K.W. testified that, at her stepsister's urging, she told her grandmother about the abuse in March of 1997. The stepsister found a letter that K.W. had written to her natural mother stating that when Mr. Lee "was there he was doing it with" her. The prosecutor had K.W. read the letter into evidence. The prosecutor also read a page torn from a diary or notebook where K.W. wrote that she hated Mr. Lee "because he did very bad things" to her. Other prosecution witnesses included K.W.'s grandmother, who provided conflicting testimony regarding how she learned of the allegations and the circumstances leading to the involvement of law enforcement; *350 the Highlands County sergeant who investigated the charges and arrested the defendant; and the investigator from the Department of Children and Family Services.
However, the most influential witness, aside from K.W., was the pediatrician who examined K.W. on March 25, 1997. Dr. Tsao testified that the grandmother reported noticing discharge on K.W.'s panties, after which the child told her that she had been "quote, forced on by a person." Concerned that K.W. had been molested, Dr. Tsao performed a vaginal exam. The grandmother was present for both the history and the examination.
Dr. Tsao's testimony focused on the condition and width of K.W.'s hymenal ring. Of most significance, in Dr. Tsao's opinion, was the presence of a nodule indicating that the hymen had been torn and formed a scar as it healed. Dr. Tsao concluded that K.W.'s hymenal ring was abnormal for a prepubescent girl, that it indicated repeated penetration, and that it was consistent with the history supplied by the child and her grandmother. When asked whether K.W.'s condition could have resulted from excessive masturbation, the pediatrician acknowledged that anything was possible but virtually excluded that possibility.
The defense case included the testimony from K.W.'s mother, who had caught K.W. masturbating as a young girl and berated her for it. At that time K.W. told her mother that a man  not Mr. Lee  had shown her how to do that. Mrs. Lee and some members of the defendant's family also testified that they had never observed anything unusual about the relationship between Mr. Lee and K.W. Mr. Lee testified on his own behalf and maintained his innocence.
The jury returned guilty verdicts on all three counts, and the judge subsequently imposed three concurrent life sentences. Mr. Lee's direct appeal was affirmed.

The Postconviction Motion
Mr. Lee's motion pursuant to Florida Rule of Criminal Procedure 3.850 stated eleven claims. The postconviction court (which was also the trial court) initially ruled that the motion was facially insufficient as to some grounds and ordered the State to respond to others. After the State's response, the court ordered an evidentiary hearing on three issues and denied the rest.
At the outset, we note that the court erred when it summarily rejected several claims after reviewing the record and concluding, in agreement with the State's assertions, that the claims were either unsubstantiated or meritless. A decision as to the facial sufficiency of a motion is a legal decision, and ordinarily the evidentiary record will be irrelevant. If, however, the claim is facially sufficient, the court must examine the record to decide whether it conclusively refutes the claim. In that event, the court must attach specific portions of the record demonstrating that the claim is refuted. See Jacobs v. State, 880 So.2d 548, 551 (Fla.2004). In this case, however, we have determined that the defendant should be granted a new trial, so further discussion concerning the sufficiency of those grounds is unnecessary.
This court's primary concern is the effectiveness of trial counsel's performance concerning handling of the child's examining pediatrician. In ground seven the defendant claimed that his counsel was ineffective in failing to obtain an expert witness to assist him with defense preparation and rebuttal of the examining physician's testimony. This claim is also relevant to ground one, which the court summarily denied, asserting that counsel *351 was ineffective for failing to object when Dr. Tsao gave opinion testimony that the most likely cause of the victim's physical condition was repeated penetration, consistent with the history given by K.W.

The Postconviction Evidentiary Hearing and Order
At the 3.850 evidentiary hearing, the defense presented testimony from a physician with expertise in child sexual battery cases. Dr. Simmons effectively contradicted the testimony of K.W.'s pediatrician that the child's physical condition indicated repeated penetration. According to Dr. Simmons, by the time of the trial and even earlier in the 1990s, experts in sexual abuse no longer accepted the theory that a change in the hymenal rim such as Dr. Tsao had observed was indicative of repeated penetration. Furthermore, the nodule described by Dr. Tsao was considered a normal variance change of a hymen. Finally, Dr. Simmons opined that it was inappropriate procedure for the pediatrician to take the child's history while the grandmother was present. All of this information, while perhaps not known to a general pediatrician, would have been available from medical studies, reports, or articles with which an expert in gynecology would have been familiar.
The issue raised in the 3.850 motion was whether Mr. Lee's trial attorney was ineffective for failing to obtain an expert witness or, at a minimum, investigate the need for one. Mr. Lee argued, both on this appeal and at the evidentiary hearing, that his attorney told him that he had a good trial case because there was no physical evidence of abuse. Although Dr. Tsao did not state that the "abnormalities" she observed in K.W. were caused by repeated penetration by a penis, she did emphatically state that the child's condition was consistent with repeated penetration by something. This presented crucial physical evidence from which the jury could infer that the victim was truthful and that the defendant was lying. See Schwarck v. State, 568 So.2d 1326, 1327 (Fla. 3d DCA 1990). At the 3.850 hearing, however, the defense attorney insisted that this evidence did not indicate whether a crime was committed at all.
At the postconviction relief hearing, Mr. Lee's trial counsel testified at length about the adequacy of his preparation for the June 1998 trial. At the time of the trial, he had been with the public defender's office for five years, but this was his first capital sexual battery case. The attorney admitted that he could not read the pediatrician's notes and could not recall whether he could read them at the time. He admitted that he did not know the meaning of certain terms in the notes, and he did not recall whether he understood them at the time. He did not ask Dr. Tsao to read her report into her deposition, which, according to the prosecutor, was a normal and effective request and which might have helped clarify the meaning of some of the medical terms.
Most crucially, however, Mr. Lee's attorney dismissed Dr. Tsao as simply a pediatrician who rendered an opinion of repeated penetration but who was not an expert. He decided that it would have been futile to have an expert review "what little the State had to prove against" Mr. Lee when "there was no physical evidence... that directly linked Mr. Lee to the crime. Much less that it ever occurred." When asked whether expert testimony that the victim's exam was also consistent with no penetration would suggest that the child might be lying, the attorney admitted that he possibly could have explored that new theory with further investigation.
The trial court made the following factual findings after the postconviction hearing:

*352 The trial began on June 8, 1998, and verdicts were returned by the jury on June 11, 1998. The defendant met with his attorney for two (2) hours on May 20, 1998, to discuss the case and the evidence in regard to the impending trial. Defense counsel wanted the defendant to agree to a request for a continuance so that he could make further discovery. Specifically he wanted to look further into any past abuse of the child victim. Defense counsel also testified he thought about hiring an expert but would have only made the request after completing all other discovery. The defendant did not want a continuance. The defendant by his testimony at the hearing said he wanted to go to trial because he thought he could win at trial because there was no physical evidence and he wanted no more continuances. Defense counsel also testified the defendant couldn't believe the state would proceed on basically one person's word against another. The defendant rejected the state's final plea offer of sixty-eight (68) months Florida State Prison and the case proceeded to trial at the defendant's request.
The trial court then relied upon that factual finding in concluding that the first prong of Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), had not been met and that the defendant had failed to show that his counsel made such serious errors as to effectively deprive him of his Sixth Amendment right to counsel. The trial court concluded that defense counsel was not deficient in failing to do further investigation because his client would not agree to an additional continuance: "While other strategies may have been employed in this case based upon further investigation by defense counsel, we will never know if they would have affected the outcome of the case because of the defendant's decision to forego further discovery and proceed to trial."

Analysis
An appellate court reviews the denial of a motion for postconviction relief alleging ineffective assistance of counsel as a mixed question of fact and law. While affording great deference to the trial court's factual findings, the court conducts an independent review of the legal conclusions flowing from those findings. As stated in Stephens v. State, 748 So.2d 1028 (Fla.1999), "under Strickland, both the performance and prejudice prongs are mixed questions of law and fact, with deference to be given only to the lower court's factual findings." Id. at 1033 (citing Strickland, 466 U.S. at 698, 104 S.Ct. 2052). An examination of counsel's performance begins with a strong presumption that it is reasonable and is considered from the attorney's perspective under the circumstances at the time of trial. Downs v. State, 453 So.2d 1102, 1106 (Fla.1984). However, to make valid strategic or tactical decisions, an attorney "has a duty to make reasonable investigations or to make a reasonable decision that particular investigations are unnecessary." Light v. State, 796 So.2d 610, 616 (Fla. 2d DCA 2001) (citing Strickland, 466 U.S. at 691, 104 S.Ct. 2052).
We do not disturb the trial court's factual finding that the defendant insisted on going to trial despite his attorney's desire to do more investigation. However, an examination of the record at the hearing reveals that the defendant did not want a continuance because his attorney had not done any preliminary investigation, well before the date of May 20, 1998, which the court cited in its order. The record supports Mr. Lee's contention that he informed his counsel at the outset of the case that the victim had made allegations *353 of prior sexual abuse by someone else, but his attorney had not explored that avenue of defense. Thus, when the attorney came to him two weeks before trial and urged a continuance, Mr. Lee refused. His attorney's opinion that there was no physical evidence of abuse in this case significantly contributed to Mr. Lee's refusal. Although no physical evidence directly connected Mr. Lee to the alleged abuse, Dr. Tsao's testimony corroborated the victim's version of the events by creating a very strong inference that some kind of abuse had occurred. Without any effective impeachment of Dr. Tsao's outdated medical opinion or any other possible explanation for K.W.'s condition  other than self-infliction, which the doctor rejected as only remotely plausible  the case against Mr. Lee was much stronger than his counsel indicated. Ironically, the circuit court thus held the defendant to a higher standard than his attorney for understanding the significance of the evidence against him.
The circuit court also ignored Mr. Lee's counsel's deficiency in failing to obtain an expert witness, concluding that Mr. Lee's resistance to a continuance foreclosed any opportunity that his attorney might have had in the normal course of events to apply for an expert after discovery had been completed. Capital sexual battery cases are complicated matters, and this was the defense attorney's first such case. The stakes were extremely high. Mr. Lee had the right to an attorney who understood the ramifications of the pediatrician's testimony. His attorney testified at the 3.850 hearing, however, that he told Mr. Lee it would be suicidal to go to trial immediately. Mr. Lee "could not believe that the State could pursue a charge of this magnitude with just the testimony of a victim without corroborating physical evidence. And I told him many times that they could and that they are. And it's going to be his word against this little girl's word at trial." But Dr. Tsao's testimony significantly bolstered K.W.'s word.
The defense attorney testified that he considered hiring an expert medical witness, but because there was no physical evidence linking Mr. Lee to the crime or even suggesting that it ever occurred, he did not think that a doctor's review of the little evidence the State had would have been helpful. He admitted that he did not consider hiring an expert to help him review the doctor's notes, many of which he could not read or understand. He also admitted that his file reflected that Mr. Lee was told, even after the doctor and the HRS investigator had been deposed, that this "was still a good triable case." The attorney relied on the fact that Dr. Tsao admitted that she could not definitely conclude that the victim's hymenal variations occurred from penetration by a penis; rather, the cause could have been a finger or any other object.
Furthermore, the attorney felt there was no need to impeach the pediatrician because she was not an expert. In his view, having a "real" expert testify that Dr. Tsao was wrong would not have clarified anything for the jury. In contrast, even the prosecutor admitted at the postconviction hearing that the doctor's testimony was important as part of the "whole puzzle" because it suggested that K.W.'s allegations could be taken seriously: after the examination her case was referred to law enforcement. Unfortunately, however, the defense attorney underestimated the potential impact of Dr. Tsao's testimony and decided that further investigation was futile.
The trial court's order also failed to address Mr. Lee's allegation and his attorney's admission that Mr. Lee promptly informed the public defender's office that the victim had made prior allegations of *354 sexual abuse. When asked why he had not questioned the victim at her subsequent deposition about the alleged sexual abuse by her biological father, the attorney could not recall if he had done so or not. However, if he had failed to question her on that issue, he did not think it was part of his overall strategy. Yet the trial court's order focuses on the fact that the defendant insisted on going to trial in spite of his attorney's advice to seek a continuance for further investigation. The trial court made no factual findings or legal conclusions about the fact that the attorney had information about previous allegations available to him almost six months before trial and did nothing about it until the eve of trial, despite knowing that his client had been unable to make bond, had been held in jail since his arrest, and was anxious for his case to be concluded. Thus, when Mr. Lee insisted on going to trial, he did so without the benefit of all of the relevant information that a reasonably prompt and thorough investigation by an effective attorney would have revealed. The circuit court erred when it found that Mr. Lee's decision to go forward with the trial negated the deficiencies in his counsel's preparation.

Conclusion
Considering prevailing professional standards and the circumstances known to trial counsel, we hold that trial counsel failed to reasonably and promptly investigate the circumstances surrounding this extremely serious crime and the medical evidence supporting the State's theory of events. "An attorney has a duty to make reasonable investigations in his or her cases." Brown v. State, 892 So.2d 1119, 1119 (Fla. 2d DCA 2004) (citing Squires v. State, 558 So.2d 401, 403 (Fla.1990)). As in Brown, trial counsel did not come forth with any strategic or tactical explanation for failing to begin the appropriate investigations more than two weeks before the scheduled trial. In Yarbrough v. State, 871 So.2d 1026 (Fla. 1st DCA 2004), a defense attorney who had information about a possible witness well before trial and who had investigators at his disposal, only halfheartedly attempted to locate what he admitted might have been a useful witness had she proved credible. The First District held that trial counsel's performance was deficient. 871 So.2d at 1029. Similarly, in this case, Mr. Lee has demonstrated that his counsel's performance fell below an objective standard of reasonableness under the first Strickland prong.
Given our holding on the first prong, Strickland requires this court to consider whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. 2052. A "reasonable probability" is defined as one that is "sufficient to undermine confidence in the outcome." Id.
In a case like this one, which turns on counsel's omissions, both the trial and appellate courts must evaluate the circumstances from the standpoint of what might have been. By analogy, in Light, 796 So.2d at 610, this court examined trial counsel's failure to investigate and call crime-scene witnesses. We compared the role of the court on postconviction review in that case to the analysis a trial judge must perform when a defendant alleges newly discovered evidence. Even though the appellate court must give the factual findings of the trial court great deference, the trial court's credibility determinations in such cases are "more limited." Id. at 617. "That is, the judge is not examining simply whether he or she believes the evidence presented as opposed to contradictory evidence presented at trial, but whether the nature of the evidence is such *355 that a reasonable jury may have believed it." Id.
If Mr. Lee's attorney had reasonably and promptly investigated allegations that the child had accused her natural father or another family member of sexual abuse, and if he had a better understanding of the significance of the doctor's testimony, he could have prepared a better defense. He might have discovered evidence that a reasonable jury might have believed. At a minimum, he could have impeached the pediatrician, and the jury would not have been left with the unchallenged impression that the medical evidence corroborated the State's theory that something of a criminal nature happened to the victim. Had the defense attorney gone further and discovered whether the victim had made prior allegations of abuse, either founded or unfounded, that information could have provided valuable impeachment of the victim's testimony. See, e.g., McGriff v. State, 601 So.2d 1320, 1321 (Fla. 2d DCA 1992) ("Evidence of a [child] victim's prior sexual encounters with others is admissible ... for the purpose of attempting to show that the defendant was not the source of the victim's injury where there is testimony about the victim's abnormal genitalia."). As it stood, defense counsel was left with the very difficult job of attempting to demonstrate that a sympathetic young child, crying on the stand, was lying.
Several commentators have noted the special problems in cases of sexual battery that occur in a familial context. Frequently, there is no issue of identity and the victim is the only eyewitness. "The accused either did or did not commit the act.... Therefore, the credibility of the victim is extremely important." Charles W. Ehrhardt, 1 Fla. Prac. Evidence § 404.18 (2004 ed.). "In such cases, the child's testimony is the only evidence of the crime, and the child's credibility becomes the pivotal factor in the case." David M. De La Paz, "Sacrificing the Whole Truth: Florida's Deteriorating Admissibility of Similar Fact Evidence in Cases of Child Sexual Abuse," 15 N.Y.L.Sch. J. Hum. Rts. 449, 449-50 (Spring 1999).
As in Light, "the minimal preparation that counsel performed should have caused counsel to realize that additional investigation was likely to be fruitful and was essential to a defense. . . ." 796 So.2d at 617. Mr. Lee, although presumed innocent until proven guilty, was left defenseless in combat against a sympathetic child witness whose pediatrician testified that she had been repeatedly vaginally penetrated. His attorney's prompt and reasonable investigation might have revealed other potential perpetrators at which a finger could be pointed; at a minimum, he could have wielded the sword of impeachment.
We conclude that Mr. Lee's counsel rendered ineffective assistance to his client. Crucial testimony from the child's physician added weight to the child's story. Nevertheless, knowing that the physician would testify that the child had been penetrated, Mr. Lee's attorney made insufficient efforts to discover if there were other explanations for K.W.'s condition. Furthermore, if Mr. Lee's attorney had made a timely, reasonable investigation and discovered not only that the child's medical condition did not suggest anything about penetration but also that she had accused others of abusing her in the past, he could have been in a better position to advise his client on whether to proceed to trial immediately, seek a continuance, or agree to a plea bargain.
This opinion should not be interpreted to mean that the evidence was legally insufficient to convict Mr. Lee. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, *356 even if the errors of counsel cannot be shown by the preponderance of the evidence to have determined the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. But Mr. Lee has carried his burden of showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052; see also Rose v. State, 675 So.2d 567, 569 n. 4 (Fla.1996). Mr. Lee has prevailed on both Strickland prongs.
We reverse the order denying postconviction relief and remand for a new trial.
ALTENBERND, C.J., and THREADGILL, EDWARD F., Senior Judge, Concur.